**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                                    )
UNITED STATES OF AMERICA              )
                                                    )
              v.                                    )          Crim. No. 05-10086-RGS
                                                    )
CLAUDIO VILLAR,                             )
         a/k/a Luis Rios-Colon,               )
         a/k/a Junior,                            )
                          Defendant.         )
_____)

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through the undersigned Assistant U.S. Attorney,

hereby sets forth its sentencing recommendation for the defendant Claudio Villar, a/k/a Luis

Rios-Colon, a/k/a "Junior" ("Villar"), who is scheduled to be sentenced by this Honorable Court

on January 24, 2006.

### A.    Relevant Background

As set forth in further detail in the Presentence Report ("PSR"), the U.S. Drug

Enforcement Administration ("DEA") conducted a federal investigation into Villar's drug

distribution activities from April 2003 until his arrest on March 1, 2005.  During that time,

Villar, either directly or through someone working for him, participated in eight (8) controlled

drug transactions orchestrated by DEA.  In each transaction, either a confidential witness

working for DEA (the "DEA-CW") or an undercover DEA Special Agent posing as a drug

customer (the "DEA-UC") purchased the drugs from Villar or someone sent by Villar.  On

March 1, 2005, Villar met with the DEA-UC to introduce him to co-conspirator William Torres-

Ocana, who was going to take over Villar's heroin business, including servicing the DEA-UC,

while Villar went on vacation. Arrests were made that day – March 1, 2005.

A chart outlining DEA's investigation follows:

| DATE | SELLER | BUYER | LOCATION | DRUG AMOUNT |
|------|--------|-------|----------|-------------|
| **UNCHARGED TRANSACTIONS:** | | | | |
| 4-11-03 | Villar | DEA-CW | Dorchester | 13.8 grams cocaine |
| 4-14-04 | Villar | DEA-CW and DEA-UC | Dorchester | 4.9 grams heroin |
| 4-22-04 | Villar (via Jonathan Villar-Ivar) | DEA-UC | Ruggles MBTA Station, Boston | 9.3 grams heroin |
| **CHARGED TRANSACTIONS (COUNTS 1-6):** | | | | |
| 6-9-04 | Villar | DEA-UC | Mass. Ave. MBTA Station, Boston | 10.0 grams heroin |
| 9-2-04 | Villar | DEA-UC | Back Bay MBTA Station, Boston | 10.3 grams heroin |
| 9-28-04 | Villar | DEA-UC | Back Bay MBTA Station, Boston | 29.2 grams heroin |
| 12-16-04 | Villar | DEA-UC | Back Bay MBTA Station, Boston | 29.5 grams heroin |
| 2-9-05 | Villar | DEA-UC | Back Bay MBTA Station, Boston | 29.8 grams heroin |
| 3-1-05 | Villar and William Torres-Ocana | DEA-UC | The Purple Shamrock Pub, Boston | N/A |
| | | | **TOTAL COCAINE:** | **13.8 GRAMS** |
| | | | **TOTAL HEROIN:** | **132.7 GRAMS** |
| | | | **TOTAL HEROIN IN COUNTS 1-6:** | **108.8 GRAMS** |

As set forth in the foregoing chart, on seven (7) occasions, Villar, himself, sold cocaine or heroin to the DEA-CW and/or DEA-UC. On April 22, 2004, however, Villar sent a courier – his brother, Jonathan Villar-Ivar – to deliver heroin to the DEA-UC for him. Likewise, on

March 1, 2005, Villar introduced a second co-conspirator, William Ocana-Torres, a/k/a Amaury Arias ("Ocana-Torres") to the DEA-UC to make arrangements for Ocana-Torres to take over his heroin business while Villar was on vacation. As noted above, DEA arrested Villar at this time.

On March 30, 2005, a federal grand jury indicted Villar for conspiring to distribute at least 100 grams of heroin in violation of 21 U.S.C. § 846 (Count 1) and distributing heroin in violation of 21 U.S.C. § 841(a)(1) (Counts 2–6). On August 16, 2005, Villar pled guilty to this six-count indictment. He is now scheduled to appear before this Honorable Court for a Sentencing Hearing on January 24, 2006.

**B.    The USSG Calculation set forth in the PSR**

The U.S. Probation Office has determined that the following U.S. Sentencing Guidelines ("USSG") apply to this case (assuming no "safety-valve" adjustment under USSG §§ 5C1.2 and 2D1.1(b)(6)):

- Base Offense Level (based on 100-400 kilograms of marijuana) = 26
- Acceptance of responsibility adjustment under § 3E1.1 =                -3
- Total Offense Level =                                              23
- Criminal History Category =                                        I
- Imprisonment Range under Sentencing Table  =              46 - 57 mos.
                                                    (trumped by 5-yr mand. min.)
- Supervised Release under § 5D1.2(b) =                       4 - 5 years
- Fine under § 5E1.2(c)(1) and (c)(4) =                       $10,000 - $7M

See PSR ¶¶ 88–87 (Base Offense Level), ¶ 93 (Acceptance of Responsibility), ¶ 94 (Total Offense Level), ¶¶99-100 (Criminal History Category), ¶ 144 (5-year mandatory minimum under 18 U.S.C. § 841(b)(1)(B); ¶ 144 (USSG imprisonment Range), ¶ 151 (Supervised Release); ¶¶ 154-56 (Fine).

The Probation Office has also determined that Villar meets Criteria 1–4 of USSG § 5C1.2 (the "safety-valve" provision). See PSR ¶¶ 95, 143. The PSR therefore provides sentencing options based on whether or not the Court determines that Villar has met the fifth criterion under USSG § 5C1.2(a)(5). See, e.g., PSR ¶¶ 95, 143, 150.

**C.      The Government's USSG Calculation**

The government agrees that Villar's Base Offense Level is 26 based on a marijuana equivalency weight of 100–400 kilograms of marijuana (PSR ¶ 87). The government also agrees that Villar is entitled to a three-level reduction for acceptance of responsibility (PSR ¶ 93). The government further agrees to the Supervised Release and Fine calculations set forth in the PSR at Paragraphs 151 and 154-56.

As set forth below, however, the government respectfully disagrees with Probation's determination as to (1) Villar's Total Offense Level and (2) Villar's Criminal History Category. In the government's view, Villar deserves a two-level role enhancement under USSG § 3B1.1(c), which results in a Total Offense Level of 25 and which disqualifies Villar from any "safety-valve" adjustment. The government also believes that the sentence imposed upon Villar by the Norfolk Superior Court on September 22, 2005, constitutes a "prior sentence" under USSG §§ 4A1.1 and 4A1.2. This places Villar into Criminal History Category II (with three criminal history points) and further disqualifies him from any "safety-valve" adjustment.

**1.      A Two-Level Role Enhancement is Warranted Under USSG § 3A1.1**

Based on the facts set forth in Paragraphs 22-30, 60-66 and 73-74 of the PSR (to which the defendant had no objection, see PSR at 32), it is the government's position that a two-level role enhancement is warranted under USSG § 3B1.1(c). According to Section 3B1.1(c), "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than

described in (a) or (b), increase [the offense level] by 2 levels." USSG § 3B1.1(c). Subsections (a) and (b) do not apply here. Instead, they apply where the defendant was an "organizer or leader" of criminal activity involving five or more participants (subsection (a)) or a "manager or supervisor" of criminal activity involving five or more participants (subsection (b)). Subsection (c), however, does apply here. As evidenced by Paragraphs 22-30, 60-66 and 73-74 of the PSR, Villar was an "organizer, leader, manager, or supervisor" of criminal activity involving <u>less than five</u> participants.

Specifically, Villar played a leadership, managerial, or supervisory role vis-a-vis (i) his brother, Jonathan Villar-Ivar, and (ii) his associate, William Torres-Ocana. The government respectfully disagrees with Probation's determination that "it is unclear as to whether the defendant was a 'leader' or a 'partner' in relation to his brother Jonathan and William Torres-Ocana." PSR at 31. According to Application Note 4 to § 3B1.1, the Court should consider the following factors in making role enhancement determinations: (1) whether defendant exercised "decision making authority," (2) the "nature of [defendant's] participation" in the offense, (3) any "recruitment of accomplices," (4) any "claimed right to a larger share of the fruits of the crime," (5) defendant's "degree of participation in planning or organizing the offense," (6) the "nature and scope of the illegal activity," and (7) the "degree of control and authority [that defendant] exercised over others." <u>See</u> USSG § 3B1.1 Applic. Note 4. Several of these factors exist with respect to both Jonathan and Torres-Ocana

First, the record clearly shows that Villar exercised decision making authority over Jonathan, recruited him as an accomplice, and planned and organized the April 22, 2004 heroin sale in which he used Jonathan as a courier. As detailed in Paragraph 22, Villar initiated the deal by calling the DEA-UC on April 14, 2004. <u>See</u> PSR ¶ 22. He then spent the next several days

negotiating the price of the heroin and planning and organizing the logistics of the transaction.
Id. at ¶¶ 22-26.  On April 22, 2004, Villar demanded that the CW participate in the deal by
accompanying either himself or his brother, Jonathan, when they met with the DEA-UC.  Id. at ¶
26.  Villar ultimately decided to send Jonathan and the CW to meet the DEA-UC.  See id. at ¶ 27
("Villar had sent Jonathan to accompany the CW to the deal").  When the DEA-UC complained
to Jonathan that Villar did not show up himself, Jonathan replied that "Villar wanted it this way
for the first deal, but stated that things would be different the next time."  Id. at ¶ 28.

Villar illustrated similar control and authority over Torres-Ocana during the March 1,
2004 meeting.  See PSR ¶¶ 60-66, 73-74.  Again, Villar made all of the arrangements for this
meeting with the DEA-UC, explaining that he "was going on vacation and his friend [Torres-
Ocana] would be taking over his business while he was gone."  Id. at 60.  When the three men
met at The Purple Shamrock pub, Villar controlled the conversation.  Specifically, with the
exception of introducing himself as "Daniel," Torres-Ocana remained silent, allowing Villar to
answer all of the DEA-UC's questions for him.  Villar set the price for the heroin deals that
Torres-Ocana would be handling for him (see PSR ¶ 64) and Villar responded for Torres-Ocana
when the UC asked about the quality of the heroin he would be providing to him for Villar, as
well as what contact number he should use to contact Torres-Ocana while Villar was away.  See
id. at ¶¶ 63-65.

In sum, the foregoing facts show that Villar played a  managerial or supervisory role vis-
a-vis his brother, Jonathan, and his associate, Torres-Ocana.  A two-level role enhancement is
therefore warranted under USSG § 3B1.1(c).  As stated in the "Background" note to § 3B1.1,
when such factors are present, a role enhancement is appropriate because "it is ... likely that
persons who exercise a supervisory or managerial role in the commission of an offense tend to

profit more from it and present a greater danger to the public and/or are more likely to recidivate."  Adding this two-level enhancement to Villar's offense level calculation renders a Total Offense Level ("TOL") of 25.  It also renders the "safety-valve" provision under USSG § 5C1.2 inapplicable.  See USSG § 5C1.2(a)(4) (conditioning safety-valve adjustment on criterion that "defendant was not an organizer, leader, manager, or supervisor of others in the offense").[1]

**2.     Villar's State Conviction Should Count as Three Criminal History Points**

The government also respectfully disagrees with Probation's determination that Villar has zero criminal history points, establishing a Criminal History Category of I.  See PSR ¶ 100.  In the government's view, the sentence imposed upon Villar by the Norfolk Superior Court on September 22, 2005 constitutes a "prior sentence" under USSG §§ 4A1.1 and 4A1.2, placing him into Criminal History Category II (with three criminal history points).  On September 22, 2005, Villar pled guilty to Trafficking in Heroin in Excess of 14 Grams in violation of Mass.Gen.L. c. 94C, § 32E, and Conspiracy to Violate the Controlled Substances Act in violation of Mass.Gen.L. c. 94C, § 40.  The Norfolk Superior Court sentenced him to "five years to five years and one day" on the trafficking charge.  See PSR ¶ 99.  Probation, however, did not count this sentence as a "prior sentence" under USSG §4A1.1(a), which adds three points "for each prior sentence of imprisonment exceeding one year and one month."  Instead, Probation treated the conviction as "relevant conduct" under USSG § 1B1.3 and Application Note 1 to § 4A1.2(a)(1), thereby removing the sentence from those counted as criminal history under § 4A1.1.  See PSR ¶ 99.

The conduct underlying Villar's September 22, 2005 state conviction, however, does not

---

[1]    Even if the Court determines that Villar has, in fact, met Criteria 1-4 of USSG § 5C1.2, Villar's defense attorney has notified the undersigned attorney for the government that Villar will *not* appear for a "safety-valve" proffer in this matter.  To date, no such proffer has taken place.

constitute "relevant conduct" under USSG § 1B1.3.  In pertinent part, Section 1B1.3 defines

"relevant conduct" as:

> (A)    all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused <u>by the defendant</u>; and

> (B)    in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions <u>of others</u> in furtherance of the jointly undertaken criminal activity,

> that <u>occurred during the commission of the offense of conviction</u>, <u>in preparation for that offense</u>, or <u>in the course of attempting to avoid detection or responsibility for that offense</u>.

USSG § 1B1.3(a)(1)(emphasis added).  If the conduct falls <u>within</u> this definition, it constitutes

conduct that is "part of the instant offense" and therefore does not count as a separate "prior

sentence" for purposes of the defendant's criminal history category.  <u>See</u> USSG § 4A1.2(a)(1)

(defining "prior sentence" as "any sentence previously imposed upon adjudication of guilt,

whether by guilty plea, trial, or plea of <u>nolo contendre</u>, <u>for conduct not part of the instant

offense</u>")(emphasis added). On the other hand, if the conduct falls <u>outside</u> of this definition, it is

"not part of the instant offense" and therefore qualifies as a "prior sentence" under USSG §

4A1.2(a)(1).  <u>See id.</u>; <u>see also</u> Application Note 1 to USSG § 4A1.2.

Here, the conduct underlying Villar's state court conviction took place on June 23, 2003,

nearly one year before the conduct constituting the instant federal offenses.  <u>See, e.g.</u>, Indictment

Count One (charging conspiracy to distribute heroin beginning no later than June 2004 through

March 1, 2005); Count Two (charging distribution of heroin on June 9, 2004).   As detailed at

Paragraph 99 of the PSR and in the Commonwealth's Statement of the Case (attached hereto as

<u>Exhibit A</u>), Villar's state charges resulted from an investigation by Quincy Police Officers who

received a tip from a confidential source that a Dominican male and female companion were

expected to deliver approximately 50 grams of heroin to a customer in the parking lot of the
Cathay Pacific Restaurant in Quincy.  Based on this information, Quincy Police Officers
conducted surveillance at the targeted parking lot, where they ultimately arrested Villar and his
female companion on the drug charges described above and seized approximately 50 grams (net
weight) of heroin from their automobile.  See generally, PSR ¶ 99; Exhibit A.

    According to Probation, this conduct "was part of the same overall scheme" that led to
the instant federal charges, despite the fact that the state charges stemmed from a separate state
investigation involving a different cooperating source.  See PSR at 30.  In support of this
conclusion, Probation relies on Application Note 8 to USSG § 1B1.3, which, as stated in the
PSR, "provides two examples: one where the state conduct is not relevant conduct; and the other
where the state conduct is relevant conduct."  Id.  Because the instant case more closely
resembles the second example in Application Note 8, Probation concludes that the state conduct
is, in fact, "relevant conduct" under §1B1.3 and therefore not a "prior sentence" under
§4A1.1(a).    The government respectfully disagrees with Probation for the following reasons.
First, the analysis must begin by defining the "offense of conviction" for purposes of § 1B1.3.
As quoted above, § 1B1.3 defines "relevant conduct" as (A) certain conduct of the defendant and
(B) certain conduct of others, so long as it occurred under one of the following three
circumstances:

> (i)     "during the commission of the offense of conviction,"
> (ii)    "in preparation for that offense," or
> (iii)   "in the course of attempting to avoid detection or responsibility for that
>          offense."

USSG § 1B1.3(a)(1) (emphasis added).  Probation's analysis ignores this important qualification.
See PSR at 29-30 (omitting this portion of § 1B1.3's definition of "relevant conduct").  This

language, however, is determinative in this case.  Unlike all of the other drug transactions attributed to the defendant in the PSR, Villar did not engage in the conduct underlying his state court conviction "during the commission of," "in preparation for," or "in the course of attempting to avoid detection or responsibility for" the instant federal offenses.  Instead, Villar's conduct in the parking lot of the Cathay Pacific Restaurant on June 23, 2003, was completely separate from the federal investigation that led to the "offense of conviction here."[2]

Second, in the government's view, the Application Note upon which Probation relies is not applicable here.  Specifically, Application Note 8 to § 1B1.3 governs situations where a <u>state sentence</u> is imposed <u>prior to</u> the defendant's commission of the <u>federal offense conduct</u>, which led to the federal charges for which the defendant is being sentenced.  As exemplified by Example (1) in the Application Note, under such circumstances, the state offense conduct is not considered "part of the same course of conduct or common scheme or plan" as the federal offense of conviction.  USSG § 1B1.3, Applic. Note 8.

Nor is Example (2) – upon which Probation relies – applicable here.  In Example (2), although the state offense conduct and the federal offense conduct are considered "relevant conduct," the example is based on two cocaine sales "<u>constituting part of the same course of conduct or common scheme or plan</u>."  <u>Id.</u> (emphasis added).  Under such circumstances, if the state sentence precedes the federal sentence, it is treated as "relevant conduct" rather than as a

---

[2]    By contrast, each of the other drug transaction attributed to Villar in the PSR were made "during the commission of," "in preparation for," or "in the course of attempting to avoid detection or responsibility for" the instant federal offenses.  Specifically, (i) each of the <u>charged</u> transactions, which began on June 9, 2004, were clearly made "during the commission of" the instant offenses of conviction, and (ii) each of the earlier, <u>uncharged</u> transactions, which took place on April 11, 2003, April 14, 2004 and April 22, 2004, were made "in preparation for" the offenses of conviction, as they were controlled buys between Villar and the DEA-CW and/or DEA-UC, during the same federal investigation that ultimately led to the larger buys for which Villar has been convicted.

"prior sentence." Id. Such facts, however, do not exist here. Unlike in Example (2), Villar's prior state offense conduct was not "part of the same course of conduct or common scheme or plan" as his federal offense conduct. Instead, as discussed above, it clearly falls outside the definition of "relevant conduct" set forth in USSG § 1B1.3.

In light of the above, Villar's conduct on June 23, 2003 should not be treated as "relevant conduct" for purposes USSG §§ 1B1.3 and 4A1.2 Application Note 1. Instead, Villar's state court conviction should count as three criminal history points under USSG § 4A1.1(a), placing Villar in Criminal History Category II. Such placement also renders USSG § 5C1.2 inapplicable.[3] See USSG §5C1.2(a)(1) (setting forth safety-valve criterion that defendant must not have more than one criminal history point).

### 3. Summary of the Government's USSG Calculation

In sum, in the government's view, the following USSG calculation applies to this case:

- Base Offense Level (based on 100-400 kilograms of marijuana) = 26
- Role enhancement under § 3B1.1(c) = +2
- Acceptance of responsibility adjustment under § 3E1.1 = -3
- Total Offense Level = 25
- Criminal History Category = II
- Imprisonment Range under Sentencing Table = 63 - 78 mos. (5-yr mand. min. also applies)
- Supervised Release under § 5D1.2(b) = 4 - 5 years
- Fine under § 5E1.2(c)(1) and (c)(4) = $10,000 - $7M

In addition, since the "safety-valve" provision under USSG § 5C1.2 is inapplicable, the 5-year minimum period of incarceration mandated by 21 U.S.C. § 841(b)(1)(B) remains intact.

---

[3] As noted above, Criterion 5 of § 5C1.2, the "safety-valve" provision, has not been satisfied in any event. See also supra note1.

**D.**     **The Government's Recommendation**

Based on the foregoing, the United States recommends that Villar be sentenced to: (i) 63 months of imprisonment, (ii) 4 years of supervised release, (iii) a fine of $10,000 unless the Court determines that the fine should be waived based on an inability to pay, and (iv) a special assessment of $100 on each count.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:      ___/s/ Lisa M. Asiaf_____
         LISA M. ASIAF

Dated:   January 18, 2006              Assistant U.S. Attorney
         Tel:  (617) 748-3268

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 18, 2006.

___/s/ Lisa M. Asiaf_____
LISA M. ASIAF

# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
CRIMINAL ACTION
NOCR 03-0363-001
NOCR 02-0364-001

COMMONWEALTH

v.

BELTIS A. CRUZ
LUIS PEREZ, JR.

---

## COMMONWEALTH'S STATEMENT OF THE CASE

---

Now comes the Commonwealth in the above-captioned matter and respectfully provides the following Statement of the Case.  The following is a brief narrative and not a complete representation of all facts known to the Commonwealth or all evidence the Commonwealth may introduce at Trial.  Further, the following is not offered as a Bill of Particulars.

During the month of June, 2003 as part of an ongoing investigation, the Narcotics Unit of the Quincy Police Department turned its attention to the parking lot of the Cathay Pacific Restaurant in Quincy.  On the evening of June 23, 2003, investigators learned that a drug transaction of approximately 50 grams of heroin was scheduled to take place between 6:30 and 7 PM.

According to information developed during the investigation, the drug would be

delivered by a male of Dominican origin, in his early 20s, approximately 5'8" in height and wearing his brown hair in cornrows. The man was expected to be in the company of a female of approximately the same age, with long brown hair and weighing approximately 140 pounds. The couple was expected to arrive in a late model grey Mitsubishi. Based upon the foregoing, the Narcotics Unit established surveillance at the lot by means of several unmarked cruisers.

At approximately 6:45 PM, a grey 2003 Mitsubishi entered the lot and stopped in the rear of the parking lot. Despite the restaurant being open, no one got out of the car. From their vantage point, the officers could see that the occupants were a man and woman fitting the description. After 10 minutes of watching the vehicle, the officers approached and identified themselves as police officers, with badges displayed.

As the occupants stepped from the car, detectives noticed the woman attempting to push a black pocketbook under the seat. After the occupants were removed from the car and identified as the Defendants, Beltis Cruz and Luis Perez, the officers retrieved five "fingers" of what appeared to be heroin from the center console of the car. The substance was later submitted to the State Lab for testing, and a preliminary certificate indicated the substance did in fact contain heroin, with a net weight of 49.95 grams.

On Thursday, August 14, 2003, the Grand Jury for Norfolk County returned Indictments against both Defendants for Trafficking in Heroin in Excess of 28 Grams, MGL c. 94C, sec. 32E and Conspiracy to Violate the Controlled Substances Act, MGL c. 94C, sec. 40.

2

Respectfully submitted,

Thomas L. Finigan
Asst. District Attorney
BBO No. 546688
45 Shawmut Road
Canton, MA 02021
(781) 830-4800 ext. 245

Dated: September 26, 2003


## CERTIFICATE OF SERVICE

I, Thomas L. Finigan, attorney for the Commonwealth in the above-captioned Indictments, hereby certify, under the pains and penalties of perjury, that I have this day served a copy of the within Statement of the Case by (X ) delivering a copy in hand (  ) mailing a copy thereof by first class mail to each attorney of record.

Dated: September 26, 2003

Thomas L. Finigan

g:\statement of case\cruz & perez.doc

3